689 A.2d 891

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Martin D. APPEL, Appellant.**

Supreme Court of Pennsylvania.

Submitted June 27, 1996.

Decided Jan. 28, 1997.

Reargument Denied April 15, 1997.

172

174

Michael Wiseman, Billy H. Nolas, Philadelphia, for Martin Appel.

John Morganelli, Bethlehem, Robert A. Graci, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

NEWMAN, Justice.

This is an appeal from an order of the Court of Common Pleas of Northampton County that denied Martin D. Appel's (Appel) Petition for Relief pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541 *et seq.* (PCRA)[1] and vacated a stay of execution of the death penalty. We affirm the Order of the Court of Common Pleas (trial court).

## I. *Facts and Procedural History*

In *Commonwealth v. Appel,* 517 Pa. 529, 539 A.2d 780 (1988) (*Appel I* ), we summarized the facts of the case as follows:

[I]n early May of 1986, appellant decided to rob a bank. He enlisted the aid of a friend, Stanley Herzog, believing that his plan would require at least two persons in order to ensure that all persons who might be in the bank at the time of the robbery could be executed before an alarm could be pressed. It was also crucial to appellant's plan that no eyewitness survive. The East Allen Township branch of the

---

1. This Court has exclusive jurisdiction of appeals from final orders denying post conviction relief in cases in which the death penalty has been imposed. 42 Pa.C.S. § 722(4), 42 Pa.C.S. § 9546(d).

First National Bank of Bath was selected as the target. Preliminary to the actual robbery, appellant and Herzog broke into the bank during the early morning hours of May 29, 1986, to ascertain the nature of the layout of the bank and the nature of its security system. During this burglary, the two men vandalized the bank in an attempt to deceive the police as to the purpose of the break-in. Appellant and Herzog then purchased handguns, appellant selecting a nine millimeter handgun for maximum 'firepower.' They practiced for the robbery by shooting at human silhouette targets. Appellant also took measures to estimate the time it would take the police to respond in the event the robbery would be reported while in progress.

On June 6, 1986, appellant and Herzog drove to the vicinity of the bank. Appellant, using a pay telephone, communicated a bomb threat to the airport located across the street from the State Police barracks closest to the targeted bank. He also telephoned the bomb threat to an Allentown radio station as well as the Allentown police. Appellant and Herzog then drove to the bank, entered, concealing their handguns, and each approached tellers' windows for the ostensible purpose of obtaining change. Appellant shot both tellers in the back as they were attempting to comply with the request. One, Janice Confer, fell to the floor wounded. The other, Hazel Evans, was killed instantly. Appellant next fired two shots at the branch manager, Marcia Hauser, but missed. He then shot across the lobby at a bank official, Jane Hartman, and a customer with whom she had been conversing. The customer was wounded but survived. Ms. Hartman dropped to the floor and hid under her desk. Appellant then ran across the lobby and shot her twice in the back, killing her instantly. In the meantime, Herzog had entered Ms. Hauser's office and shot her through the head. She survived but is permanently disabled.

Appellant and Herzog then proceeded behind the teller's counter to collect the deadly object of their greed. Appellant discovered, however, that Ms. Confer, one of the tellers

he had shot, was still alive. In accordance with his master plan, he shot her again in the back, the bullet penetrating her heart and lungs and causing her death. The robbers had collected approximately $2,280.00 when an automobile approached the bank's drive-in window, whereupon they fled in appellant's vehicle.

Appellant and Herzog were apprehended by the State Police approximately two hours and thirty minutes later. Appellant subsequently gave full and complete confessions to an agent of the Federal Bureau of Investigation and to a State Police Trooper.

517 Pa. 529, 534–536, 539 A.2d 780, 782–783.

Appel appeared before the trial court on June 12, 1986, and said that he wanted to represent himself. He also expressed concern that professional legal representation would hamper the prosecution's case against him. The trial court conducted a thorough colloquy concerning Appel's waiver of his right to counsel, and Appel indicated throughout the colloquy that he understood his rights and wanted to waive his right to counsel. Before accepting Appel's waiver, the trial court ordered a competency evaluation.

Janet Schwartz, M.D., performed the first psychiatric evaluation of Appel in 1986. Dr. Schwartz is board certified in both psychiatry and neurology, and was familiar with competency evaluations because she had performed them prior to her evaluation of Appel. Before examining Appel, Dr. Schwartz met with John Weaver, a social worker for Northampton County's Mental Health and Mental Retardation Unit, who had interviewed Appel and obtained a detailed social history. She also spoke with the stand-by counsel appointed by the trial court to represent Appel, and she reviewed various documents including police reports and Appel's arrest record provided to her by the District Attorney's Office.

Dr. Schwartz familiarized herself with the facts of the crime from a police report/arrest record, and then personally conducted a mental status examination of Appel and found no evidence of any formal thought disorder or flight of ideas.

She found no evidence of delusions, nor could she elicit delusions through the use of psychological tests. Lastly, Dr. Schwartz found no evidence of any psychosis nor any evidence of mental disorders that would affect Appel's ability to function in court. When Dr. Schwartz asked Appel about the facts of the robbery and murders, he said that he conceived the idea about a month earlier, and that it was the fastest way to get a large sum of money. In her report to the trial court, dated June 17, 1986, which was made part of the record of the trial court, Dr. Schwartz stated the following:

Diagnosis: No mental illness.

Impressions: Mr. Appel appears to have made a rational and well-thought-out decision that he would like to receive the death penalty and would like this to occur as soon as possible. On the basis of my examination, I feel that he is competent to make this decision and to refuse counsel.

On June 20, 1986, Appel reiterated in court that he wanted to proceed without counsel. After reviewing Dr. Schwartz' competency evaluation, the trial court accepted Appel's waiver of his right to counsel. The trial court appointed two members of the Northampton County public defender's office to serve as stand-by counsel, and the court made it clear that if Appel changed his mind, the court would appoint counsel to represent him. Appel said that he was a graduate of Bloomsburg State College with a B.A. in psychology, having received his degree on May 10, 1980, and that he clearly understood everything that the judge was stating to him.

At the request of defense counsel, the trial court ordered a second psychiatric evaluation. On August 19, 1986, psychiatrist Paul Kenneth Gross, M.D., met with Appel for two hours to perform his evaluation and consulted with psychologist Dolores Kristofits, who had done psychological testing.[2] Dr. Gross identified a "narcissistic personality disorder" present in

2. Appel's standby counsel retained Kristofits to make a psychological assessment of Appel in 1986. After performing a battery of psychological tests on July 23 and August 1, 1986, she determined that Appel suffered from emotional disturbances, but was nevertheless legally competent.

Appel, which is associated with such factors as a grandiose sense of self importance or uniqueness, exaggeration of achievements and talents, preoccupation with fantasies, and feelings of rage. In his report dated August 27, 1986, Dr. Gross stated that he found "no evidence of any psychosis on the part of Mr. Appel." Dr. Gross concluded that Appel was competent, stating "he knows the nature and quality of his behavior and can appreciate the consequences of his own behavior." Notes of testimony, May 18, 1995, p. 69.

Appel subsequently waived his preliminary hearing, and, on July 20, 1986, he announced that he wanted to plead guilty to all charges against him, including three counts of first degree murder. The trial court did not allow Appel to plead guilty to any counts of first degree murder,[3] but instead accepted his pleas of guilty to three counts of murder generally, and to the following other charges: two counts of attempted murder in the first degree, two counts of aggravated assault, one count of robbery, eight counts of criminal conspiracy, burglary, criminal mischief, and terroristic threats.

A degree of guilt hearing commenced on August 7, 1986 to determine the degrees of the three counts of murder to which Appel pled guilty. At that hearing, the Commonwealth presented extensive testimony and submitted numerous exhibits during a three-day period. After the hearing on August 9, 1986, the trial court found Appel guilty of three counts of first degree murder.

The trial court again informed Appel of his right to counsel during the penalty phase and Appel again waived his right to counsel. During the penalty phase, Appel made the following statement to the trial court:

Okay, Your Honor. I would like to state for the record, that during the entire proceedings and/or hearings in this matter, I have been very much aware of what is going on.

3. In Pennsylvania, a defendant may not enter a guilty plea to murder in the first degree. *Commonwealth ex rel. Kerekes v. Maroney,* 423 Pa. 337, 223 A.2d 699 (1966). Instead, a defendant may plead guilty to murder generally, and the burden is then on the Commonwealth to prove that the offense meets the requirements of murder in the first degree. *Id.*

That is to say, I am rational, sane, competent and alert. I have had plenty of opportunities to discuss and consult with stand-by counsel, Mr. Crowe and Ms. Kraft. And, I have consulted with them on various occasions.

I feel that by cooperating with the prosecution and by pleading guilty to all charges, that I have done the honorable thing. And, I hope that I have set a precedent here today for all future defendants in so doing.

The only mitigating factors that I wish to enter into the record, would be:

One, that I have had no prior felony convictions against me; and,

Two, that I was gainfully employed at the time of my arrest.

I would also like to say that I will not appeal your decision or any decisions that you made. Furthermore, I trust that the American Civil Liberties Union will not interfere with this matter and that no other outside legal aid groups will make any appeal [on] my behalf.

That's all.

Notes of testimony, August 9, 1986, p. 367. During closing argument, the Commonwealth urged the court to sentence Appel to death. When again questioned concerning his position, Appel repeated his request for the death penalty. After deliberation, the trial court returned sentences of death for each of the three counts of first degree murder, finding that the Commonwealth had proved the following two aggravating circumstances beyond a reasonable doubt: (1) Appel killed the victims to prevent their testimony against him in a criminal proceeding, 42 Pa.C.S. § 9711(d)(5); and (2) Appel committed the killings in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6). The trial court also found one mitigating circumstance, that being Appel's lack of a prior record of felony convictions. The Court concluded that the aggravating circumstances outweighed that mitigating factor.

Appel did not file post-verdict motions and, on September 3, 1986, the trial court imposed three death sentences and a

consecutive aggregate term of forty-two to eighty-four years imprisonment. Again, Appel stated that he did not want an appeal to be filed on his behalf, and he wanted to be executed. Nevertheless, the record was transmitted to this Court in accordance with Pa.R.A.P.1941 and *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *rehearing denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). Although no issues were presented to this Court on appeal, we independently reviewed the following two issues:

(1) whether the evidence is sufficient to support Appel's three convictions of first degree murder pursuant to *Zettlemoyer*; and

(2) whether the sentences were "the product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S. § 9711(h)(3)(i); whether the evidence supports the finding of a valid aggravating circumstance, 42 Pa.C.S. 9711(h)(3)(ii); and whether the sentences are excessive or disproportionate to the penalty imposed in similar cases, 42 Pa.C.S. § 9711(h)(3)(iii).

This Court affirmed the judgments of sentence on March 28, 1988.

On February 28, 1995, the Honorable Thomas J. Ridge, Governor of Pennsylvania, issued a death warrant, which set the date of Appel's execution for the week of April 4, 1995. On March 29, 1995, Appel's current counsel filed a PCRA petition and an Application for Stay of Execution with the trial court.[4] The PCRA petition was assigned to the same judge

4. In the PCRA petition, Appel alleged: (1) he was mentally ill and incompetent at the time of his guilty plea, degree of guilt, and sentencing proceedings in 1986; (2) the Commonwealth was in violation of the directives of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and of several provisions of the U.S. and Pennsylvania Constitutions, by failing to provide exculpatory evidence regarding Appel's history of mental illness; (3) he received ineffective assistance of counsel during the 1986 court proceedings; (4) he was not afforded a reliable evaluation of his impaired mental health and competency and was thus deprived of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution; (5) the

who presided over Appel's guilty plea and who imposed sentence. On March 30, 1995, the trial court issued an Order staying the execution pending disposition of Appel's PCRA petition.

The trial court held evidentiary hearings beginning May 6, 1995, and ending May 19, 1995. Appel was represented by counsel during the PCRA proceedings before the trial court. By Order and Opinion filed June 14, 1995, the trial court denied Appel's PCRA petition and vacated its prior stay of execution. Appel, represented by the same attorneys who represented him in the PCRA proceedings below, now appeals from the trial court's denial of post conviction relief.

## II. Issues

In his appeal, Appel presents the following issues for our review:

A. Whether Appel is entitled to relief from his conviction and death sentence because confidence in the reliability of the original competency evaluation and ruling has been undermined and/or because Pennsylvania has employed an unconstitutional standard for evaluation of competency.

B. Whether Appel is entitled to relief because he was denied assistance of counsel during the original trial court proceedings.

C. Whether Appel is entitled to relief from his conviction and sentence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.

sentence of death was in violation of Pennsylvania's *corpus delicti* rule, and, thereby, the Eighth and Fourteenth Amendments to the U.S. Constitution, in that the sentence was based upon the court's finding of an aggravating circumstance that was not supported by evidence besides Appel's own confession; and (6) that the trial court did not consider and give full effect to the evidence of Appel's illness as a mitigating factor in sentencing.

Appel sought relief in the form of an Order vacating his convictions and sentences, or, in the alternative, a new sentencing hearing to permit him to introduce evidence of mental illness as a mitigating factor.

D. Whether Appel is entitled to relief from his conviction and sentence because he was not afforded a reliable evaluation of his impaired mental health and competency and was thus deprived of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution.

E. Whether Appel is entitled to relief from his death sentence because the trial court was prevented, by a combination of constitutional errors, from considering and giving full effect to the evidence of Appel's mental illness as evidence weighing against imposition of the death penalty.

F. Whether Appel is entitled to relief from his death sentence because he was sentenced on the basis of the trial court's finding of an aggravating circumstance that was not supported by evidence aside from Appel's own confession, thereby violating the *corpus delecti* rule, the Eighth and Fourteenth Amendments to the United States Constitution, and the corresponding provisions of the Pennsylvania Constitution.

G. Whether Appel is entitled to relief from his conviction and sentence under this Court's King's bench powers and its supervisory authority over the lower courts.

H. Whether inaccuracies in the PCRA transcripts undermine Appel's Eighth and Fourteenth Amendment rights to meaningful appellate review.

### III. *Eligibility For PCRA Relief*

■■■ To be eligible for PCRA relief, a defendant must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated errors or defects found in Section 9543(a)(2),[5] and the issues

5. Section 9543 of the PCRA provides, in pertinent part:

have not been previously litigated. An issue is deemed finally litigated for purposes of the PCRA if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2). If the allegations of error have not been finally litigated, the appellant must also establish that those allegations of error have not been waived and that, if waived, the conditions listed in Section 9543(a)(3)(ii) or (iii) must be satisfied.[6] 42 Pa.C.S. § 9543(a)(3). An issue is deemed

(a) General rule.-To be eligible for relief under this subchapter, a person must plead and prove by a preponderance of the evidence all of the following:

$$* \quad * \quad * \quad * \quad * \quad *$$

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of Pennsylvania or laws of this Commonwealth or the Constitution of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused an individual to plead guilty.

(iv) The improper obstruction by Commonwealth officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

(v) A violation of the provisions of the Constitution, law or treaties of the United States which would require the granting of Federal habeas corpus relief to a State prisoner.

(vi) The imposition of a sentence greater than the lawful maximum.

(vii) A proceeding in a tribunal without jurisdiction.

6. Section 9543(a)(3), as it existed at the time of Appel's PCRA hearing, provided:

That the allegation of error has not been previously litigated and one of the following applies:

(i) The allegation of error has not been waived.

(ii) If the allegation of error has been waived, the alleged error has resulted in the conviction or affirmance of sentence of an innocent individual.

(iii) If the allegation of error has been waived, the waiver of the allegation of error during pretrial, trial, post-trial or direct appeal proceedings does not constitute a State procedural default barring Federal habeas corpus relief.

waived "if the petitioner failed to raise it and if it could have been raised before the trial, at the trial, [or] on appeal...." 42 Pa.C.S. § 9544(b). Finally, the appellant must demonstrate that the failure to litigate the issue prior to trial, during trial, or on direct appeal could not have resulted from any "rational strategic or tactical decision by counsel." 42 Pa.C.S. § 9543(a)(4).

## IV. *Competency in 1986*

### A. *Applicable Legal Standards*

Appel first argues that he is entitled to relief because he was incompetent during the time he pled guilty, waived his right to counsel, and was sentenced to death. Appel claims that the original competency evaluation and the trial court's determination of competency based on that evaluation in 1986 are unreliable and have been undermined by the testimony of witnesses he presented at the PCRA hearing.

▆▆▆ A defendant's competency is an absolute and basic condition of a fair trial, and conviction of a legally incompetent defendant violates his constitutionally guaranteed due process rights. *Commonwealth v. Marshall*, 456 Pa. 313, 318 A.2d 724 (1974). Section 402(a) of the Mental Health Procedures Act[7] provides that a defendant is legally incompetent if he or she is "substantially unable to understand the nature or object of the proceedings against him [or her] or to participate and assist in his [or her] defense."[8] 50 P.S. § 7402(a). Stated otherwise,

42 Pa.C.S. § 9543(a)(3)(Effective April 13, 1988, amended November 17, 1995).

7. Act of July 9, 1976, P.L. 817, No. 143, § 402, *as amended,* 50 P.S. § 7402(a).

8. Competency to stand trial is not to be confused with the defense of insanity. Competency to stand trial pertains to the time of the trial or other legal proceedings, while sanity concerns the time of the commission of the offense. In *Commonwealth v. Higgins,* 492 Pa. 343, 424 A.2d 1222 (1980), *cert. denied,* 452 U.S. 919, 101 S.Ct. 3057, 69 L.Ed.2d 424 (1981), this Court held that a defendant who had been suffering from a lengthy and chronic psychological illness was nonetheless competent to stand trial. In *Higgins,* we stated the following:

the relevant question is whether the defendant has sufficient ability at the pertinent time to consult with counsel "with a reasonable degree of rational understanding," and have a "rational as well as a factual understanding of the proceedings." *Commonwealth v. Hughes*, 521 Pa. 423, 435, 555 A.2d 1264, 1270 (1989) (*quoting, Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)).

Additionally, a determination of a defendant's competency to stand trial rests in the sound discretion of the trial court and can be disturbed only on a showing of an abuse of that discretion. *Commonwealth v. Sam*, 535 Pa. 350, 635 A.2d 603 (1993), *cert. denied* 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994). This Court has also stated that the sensitive nature of competency determinations requires that a trial judge's conclusions be afforded "great deference" because the judge has the opportunity to personally observe a defendant's behavior. *Commonwealth v. Chopak*, 532 Pa. 227, 235, 615 A.2d 696, 700 (1992). *See also, Commonwealth v. McGill*, 545 Pa. 180, 680 A.2d 1131 (1996) (trial court's observations of defendant during colloquies and throughout trial supported the conclusion that appellant was competent to stand trial). Furthermore, when making a competency determination, the trial court may resolve conflicts in the testimony of expert witnesses and may accept an expert's opinion if the record adequately supports it. *Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1, *cert. denied,* 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987). *See also Hughes* (where the record reveals that the Commonwealth's expert witnesses were familiar with the defendant's condition and had sufficient information upon which to base their opinions, the trial court does not err in choosing to accept the Commonwealth's experts' opinions rather than those of defendant's experts).

> "The test to be applied in determining the legal sufficiency of [a defendant's] mental capacity to stand trial, or enter a plea at the time involved, is not the M'Naghten 'right or wrong' test, but rather his ability to comprehend his position as one accused of murder and to cooperate with his counsel [in making a rational] defense."

*Id.* at 233—234, 615 A.2d at 699. Appel does not claim that he was insane when he committed this crime.

It is the burden of the person asserting mental incompetency to establish such incompetency by a preponderance of the evidence. 50 P.S. § 7403(a)(amended July 2, 1996); *Commonwealth v. duPont,* 545 Pa. 564, 681 A.2d 1328 (1996). During the 1986 court proceedings in this case, former Section 7403(a) of the Mental Health Procedures Act provided that a party seeking to show incompetency "shall have the burden of establishing incompetency to proceed by clear and convincing evidence." 50 P.S. § 7403(a)(repealed, July 2, 1996). That statute was still in effect during Appel's PCRA proceedings in the lower court, which concluded on June 14, 1995.

Appel now cites the United States Supreme Court's April 1996 ruling in *Cooper v. Oklahoma,* —— U.S. ——, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), to challenge the "clear and convincing evidence" standard contained in the former Section 7403(a). In *Cooper,* the United States Supreme Court held that an Oklahoma statute that required a defendant alleging incompetency to establish such by "clear and convincing evidence" violates the defendant's due process rights under the Fourteenth Amendment of the United States Constitution, and the proper standard is proof by a fair preponderance of the evidence. This Court recently followed *Cooper* in *duPont,* in which we held former Section 7403(a) of the Mental Health Procedures Act unconstitutional, and we held that a defendant who asserts his or incompetency bears a burden of proof by a fair preponderance of the evidence. Although *Cooper* and *duPont* have affected the statutory burden of proof at competency hearings, Appel is not entitled to relief because the trial court determined that Appel did not meet his burden of proof pursuant to either the clear and convincing evidence standard or the preponderance of the evidence standard.

In its Opinion in the present case, the trial court first applied the clear and convincing standard, but also held that Appel did not meet his burden of proof pursuant to the preponderance of the evidence standard. Because the trial court specifically held that Appel failed to meet his burden of proof pursuant to the proper preponderance of the evidence standard, any application of the clear and convincing standard

according to the former section 7403(a) in this case was harmless error. *See Commonwealth v. Story,* 476 Pa. 391, 405, 383 A.2d 155, 162 (1978)(where a trial court violates the federal constitution, this Court must employ the federal harmless error rule and must determine whether the error was harmless beyond a reasonable doubt); *see also Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)(where a violation of a federal constitutional right constitutes harmless error, reversal is not required).

### B. *Evidence Concerning Competency Presented at the PCRA Hearing*

In the PCRA proceedings below, Appel alleged that he was unable to participate in his defense in 1986 because he suffered from delusional thinking that made it impossible for him to accept the assistance of an attorney or to participate in his defense. Specifically, he claimed that in 1986, he suffered from an "encapsulated delusion," and he believed that his killing of the people in the bank was a secret Central Intelligence Agency (CIA) mission to eliminate "moles and clones" working in the bank. According to Appel, his delusions in 1986 required that he could not offer a defense to the prosecution or the imposition of the death penalty.[9]

To support his claims of incompetency, Appel presented evidence concerning his personal history, character and mental condition until 1986, including the testimony of his mother, his girlfriend, acquaintances, and co-defendant Herzog. These individuals described numerous incidents of strange behavior that Appel allegedly exhibited for several years. According to some of these lay witnesses, Appel was preoccupied with the military, the CIA, and with military

9. As stated previously, Appel did not challenge his legal sanity in the PCRA hearings. *See* footnote 8. Nevertheless, Appel's state of mind before and during the commission of this crime are relevant because Appel claims that his delusions existed at those times. Thus, we will discuss evidence of Appel's motive to commit this crime because this evidence of motive is inextricably related to his claims of incompetency and allegations of delusions.

intelligence.[10] Appel did not testify in the PCRA proceedings, other than to explain that he wanted his current attorneys to represent him during the PCRA proceedings.

Appel also presented extensive testimony from experts in the mental health field, who gave differing diagnoses and opinions regarding Appel's mental health status during the 1986 court proceedings. Several defense experts, who did not examine Appel until 1995, opined that Appel was delusional and incompetent at the time of the 1986 court proceedings.[11]

10. Herbert Ring, a former supervisor in the Lehigh County Jail, testified that he observed Appel acting strangely when he worked as a corrections officer under Ring's supervision in 1983. Former death row inmate Jay Smith, a former psychologist, testified about his observations of Appel and his unusual behavior while they were in prison together. The defense had not subpoenaed Smith for the PCRA hearing, but he nevertheless attended the court proceedings and volunteered to testify for Appel.

Yvonne Duggan, Appel's girlfriend from 1983 to 1986, testified concerning Appel's appearance and odd behavior. She also explained Appel's desperate financial situation and recounted his statements about committing this crime for money. Co-defendant Herzog also described Appel's unusual behavior and discussed the six-month crime spree they committed before robbing the bank. Appel's mother testified concerning Appel's family history of Graves disease and she also described her observations of Appel's unusual behavior.

The defense also presented Dr. Frank D'Attilio, a clinical psychologist, who never treated Appel, but met him several times in 1984 when he was treating one of Appel's friends. Dr. D'Attilio described Appel's behavior at that time as bizarre, and he stated that Appel appeared to be delusional, although he could not give an opinion with a reasonable degree of psychological certainty. Social worker John Weaver, a mental health caseworker for Northampton County, testified that he interviewed Appel after his arrest in 1986 to obtain a social history for his psychiatric evaluation. Weaver stated that Appel understood the purpose of the interview, and Appel stated that he wanted to take responsibility for what he had done.

11. James Merikangas, M.D., who is board certified in psychology and neurology, reviewed Appel's records and examined him on April 22, 1995. He opined that Appel suffered from Graves disease in 1986 and that he was psychotic, delusional and incompetent at that time. Dr. Merikangas also believed that the competency evaluations conducted at the time of the original court proceedings were incomplete.

Henry Dee, M.D., a psychologist and neurologist, testified that he reviewed Appel's file and interviewed him on March 17, 1995. Dr. Dee opined that in 1986, Appel was delusional, psychotic, incompetent, and appeared to be schizophrenic at times.

None of these defense experts examined Appel before or during the 1986 court proceedings. Although they relied on the records and reports from that time, Appel's experts examined him nine years after his guilty plea and sentencing. The trial court expressly considered this factor when it rejected their testimony.

In addition, Appel introduced testimony from the three experts who examined him in 1986, Dr. Schwartz, Dr. Gross and psychologist Dolores Kristofits. All three of these experts concurred in their prior determinations that Appel was competent during the 1986 court proceedings. Dr. Schwartz and Dr. Gross both testified that they did not have information regarding Appel's bizarre behavior or about his alleged CIA delusions in 1986. However, both testified that if they had such information, it would not have changed their respective recommendations.

Appel also introduced expert opinion testimony that he suffered from Graves disease in 1986 and that this condition contributed to his alleged mental illness at that time.[12] The

Stuart Wellman, Ph.D., a clinical psychologist employed by the State Correctional Institution at Pittsburgh, testified that he met with Appel on March 6, 1995. Dr. Wellman testified that Appel was chronically psychotic and delusional. He also opined that Appel was psychotic and delusional in 1986, although he did not examine him at that time.

Jethro W. Toomer, Ph.D., a licensed psychologist, reviewed Appel's records and examined him on April 19, 1995. Dr. Toomer opined that Appel suffered from a paranoid delusional psychotic disorder and was incompetent during the 1986 court proceedings.

12. Graves disease, or hyperthyroidism, is characterized by an enlarged thyroid, a rapid pulse, and increased metabolism due to excessive thyroid secretion. Appel suffered from Graves disease in 1990 and underwent thyroid surgery while he was in prison. At the PCRA hearing, Appel presented Jan Ulbrecht, M.D., an endocrinologist, who testified concerning Graves disease and his treatment of Appel's thyroid condition in 1990. Dr. Ulbrect also testified that pre-existing mental illness could be worsened by Graves disease in a minority of cases.

The Commonwealth's experts opined that Appel did not suffer from Graves disease in 1986. The Commonwealth also introduced a transcript of a 1993 interview with Appel in which he stated that Jay Smith, a former psychologist and death row inmate, gave Appel the idea that he could use his Graves disease as a basis to appeal on the theory that the thyroid condition somehow affected his behavior. The trial court

trial court did not credit the expert testimony concerning incompetency and delusions introduced by Appel's defense team, and instead accepted evidence that Appel was competent during the 1986 court proceedings and that he simply committed these crimes for money.

To rebut Appel's belated allegations of incompetency, the Commonwealth introduced considerable evidence that Appel's motivation for this crime was to get money, and that he had rational reasons for wanting to plead guilty and be executed. The Commonwealth also presented expert testimony that Appel was competent during the 1986 court proceedings.

Albert Levitt, a forensic psychologist for the Court of Common Pleas of Philadelphia and former chief psychologist for the Pennsylvania Board of Probation and Parole, also testified for the Commonwealth. Mr. Levitt did not examine Appel, but reviewed Appel's prison records, test results, and reports prepared by the defense experts. Levitt concluded that Appel was legally competent during the 1986 court proceedings. Levitt also testified that Appel suffered from a "character disorder," but was not mentally ill. He opined that Appel was using the CIA story to manipulate others, and that Appel was not delusional and had never been.

Kenneth Kool, M.D., a board certified psychiatrist, also testified for the Commonwealth. Dr. Kool testified that Appel was not delusional in 1986 and was competent during the court proceedings. He based his opinions on a videotape of an interview with Appel, Levitt's analysis, Kristofits' testing, Dr. Schwartz' report, Dr. Gross' report, and a transcript of the court proceedings. Dr. Kool's opinions were not limited to Appel's competency during the 1986 court proceedings, but also concerned Appel's state of mind when he committed this crime. Dr. Kool concluded that Appel was not psychotic, but that he had sociopathic features, criminal goals, and the capacity to act on them. He noted that no physician from 1986 to 1994 diagnosed Appel as having a major mental illness

found that it was "doubtful" that Appel suffered from Graves disease in 1986.

and that the intricacy of the planning of the robbery, negated the possibility of a major or discrete mental illness.

During the PCRA proceedings below, the trial court also reviewed the 1986 reports of Dr. Schwartz, the first court appointed psychiatrist, and Dr. Gross, the second psychiatrist appointed at the defense's request. Both of those reports concluded that Appel was competent then. Also, the two doctors testified during the PCRA hearing and continued to hold their opinions that Appel was competent during the 1986 court proceedings.

Dr. Schwartz testified at the PCRA hearing that Appel demonstrated no evidence of Graves disease, that he was not delusional, and that he told her that he committed the bank robbery because it was the easiest way to get quick money to pay his bills and help his girlfriend. · He also told her that he shot the victims because he did not want to leave any witnesses, and that he expected to get a lot more money than he did. In addition, Appel gave Dr. Schwartz the following rational reasons for wanting imposition of the death penalty: it was preferable to spending the rest of his life in prison; he thought that God might forgive him if he cooperated with the state in the prosecution; if he died, his girlfriend would receive insurance benefits; he wanted to die because he deserved to die; and his death might be a comfort to the victims' friends and families.

On May 6, 1987, nearly one year after the murders, Appel gave an interview for a television documentary entitled "In the Mind of a Murderer." The Commonwealth introduced a videotape of excerpts from that interview during the PCRA hearing to allow the trial court to observe Appel's demeanor at that time, and to show that Appel continued to admit that his motivation for robbing the bank was to get money, and that he killed the victims so that they would not be able to testify against him.

Another Commonwealth exhibit at the PCRA hearing was a videotape of a deposition of Appel dated April 18, 1990, taken in connection with a civil lawsuit against the bank and other

parties. In that deposition, Appel stated that he selected the First National Bank of Bath because it was physically isolated. Both of these videotapes belied Appel's current claims that he robbed this bank and killed people inside because he believed that there were CIA "moles" in this bank.

The Commonwealth also introduced a transcript of a taped interview with Appel on September 16, 1993. During the interview, Appel explained that his idea to use Graves disease as a basis to appeal came from Jay Smith, a former inmate on death row.[13] Appel also explained that he robbed the bank to get money for his girlfriend, and that if they caught and executed him, she would get insurance proceeds. Appel said that he enjoyed being in control of the court proceedings and assisting the Commonwealth in his prosecution.

The Commonwealth also introduced the testimony of several lay witnesses who testified concerning their interactions with Appel after his arrest. Social worker John Weaver testified that he interviewed Appel shortly after his arrest and Appel told him that money was the motivation for committing this crime. John Spirk, one of the assistant district attorneys who prosecuted Appel testified that he spoke to Appel many times because Appel represented himself and that Appel appeared to understand the court proceedings. Another assistant district attorney, Anthony Blasco, testified that Appel told him that during the first six months of 1986, he and Herzog were not making enough money and decided to do something "bigger." The Commonwealth also introduced a videotape of Appel's civil deposition testimony, in which Appel stated that he had cased four banks, and chose the First National Bank of Bath because it was physically isolated.

According to Appel's former girlfriend's PCRA hearing testimony, Appel was spending more money than he was

13. It appears that Jay Smith, a former psychologist and death row inmate, played a significant role in Appel's PCRA petition. According to Appel, Smith conceived the theory of using Graves disease as a basis to appeal while he was in prison with Appel. Smith also was present at the PCRA hearing and gave testimony for Appel, although neither the Commonwealth nor the defense had subpoenaed Smith to the PCRA hearing.

making, and he was also giving money to her. She testified that Appel was always talking about money, and that he once told her that he could kill everybody at a bank and get $15,000. Before the robbery, he told her that he was going to rob a bank and kill everyone so there would be no witnesses. Appel told his girlfriend that he considered robbing the Holiday Inn, where she worked, and that he had "cased" other banks, but selected this particular bank because there were not too many people there.

Earlier in the week of the murders, Appel said to her, "Friday is payday," and that she would not have to worry about money because there would be a "big payday." Appel's payday was normally Wednesday at that time, and on the Wednesday before the robbery, he gave her his entire paycheck. Appel also told her that he made her the beneficiary of his life insurance, and that he wanted her to get the insurance proceeds. Thus, contrary to Appel's recent claims of CIA delusions, Appel's statements to his girlfriend before these murders clearly exhibited that a desire to obtain money motivated him.

Co-defendant Herzog corroborated Appel's girlfriend's testimony that he robbed the bank to obtain money. Herzog testified that he and Appel had been on a six-month crime spree consisting of thefts and strong-arm robberies before the bank robbery. Herzog stated that he participated in these crimes just for the thrills, and that he always let Appel keep the money they stole. Before the June 6 robbery, he and Appel had cased other banks, but picked the First National Bank of Bath because it was in an isolated rural area. Herzog stated that one of the reasons they chose June 6 to commit the robbery was that it was a Friday and there would be more money in the bank because people would be cashing their paychecks.

In its well-reasoned opinion, the trial court considered all of the evidence besides its own observations of Appel in 1986 and 1995. Most notably, the trial court found that Appel participated in the colloquies in a meaningful way and fully comprehended the court's instructions. The trial court had numerous

opportunities to observe Appel's demeanor throughout the court proceedings in 1986 and concluded that Appel could understand the nature and object of the proceedings against him and to participate and assist in his defense. The trial court concluded that Appel was not operating in a delusional state during court proceedings in 1986 and that he was legally competent at that time.

Based on the record before us, there is no basis for this Court to conclude that the trial court abused its discretion when it determined that Appel was competent during the 1986 court proceedings. To the contrary, the record shows that the trial court was vigilant in ensuring that Appel was competent by ordering a competency evaluation *sua sponte* before accepting Appel's waiver of his right to counsel, and by granting a defense request for a second competency evaluation. The trial court's opinion expressly states that the court accepted the expert testimony presented by the Commonwealth, and rejected the testimony of the defense experts who concluded that Appel was incompetent.[14]

As Dr. Kool explained before the trial court, this case is an example of a criminal person with a criminal goal, who carefully planned, practiced, and rehearsed this crime to obtain money. The trial court properly rejected Appel's belated claims of incompetency and CIA delusions. Accordingly, this claim does not warrant relief pursuant to the PCRA.

## V. *Ineffective Assistance of Counsel*

 Appel also claims that he is entitled to relief because his court-appointed stand-by counsel did not provide effective

14. The trial court also found that Appel's claim of CIA delusions were a "conscious deceit and misrepresentation of self." Trial court Opinion, p. 28. Although the trial court was not required to make this finding of fact in order to decide the competency issue, we note that this finding is supported by evidence in the record. Specifically, Dr. Kool testified that Appel's story about CIA delusions was "a conscious deceit and misrepresentation of self, trying to present himself as being an unusual individual.... [I]t's part of his immature character, his sociopathological and paranoid personality and his narcissism to misrepresent, to self-aggrandize himself consciously so as to impress other people." Notes of testimony, May 19, 1995, p. 222.

assistance during the period preceding the trial court's ruling on Appel's competency. Specifically, Appel asks us to find that his stand-by counsel were deficient because they: (1) did not investigate Appel's background; (2) spoke to no one who knew Appel; (3) did not obtain records about Appel; and (4) provided no information about Appel's alleged history of mental illness to the court-appointed psychiatric experts or to the court itself.

In *Commonwealth v. Griffin*, 537 Pa. 447, 644 A.2d 1167 (1994), this Court held that claims of ineffective assistance of counsel are not cognizable during post-trial proceedings, when the defendant has previously insisted on representing himself. In *Griffin*, the defendant was represented by counsel at a jury trial that resulted in his conviction for first degree murder and sentence of death. After that, trial counsel filed post-trial motions, and the defendant also filed post-trial motions *pro se* in which he alleged ineffective assistance of trial counsel. The defendant represented himself at a post-trial evidentiary hearing, with a public defender serving as stand-by counsel. The trial court denied post-trial relief, and on direct appeal, this Court affirmed the conviction and sentence of death. The defendant then filed a PCRA petition, in which he alleged that stand-by counsel was ineffective at the PCRA hearing. This Court stated the following in *Griffin*:

The Superior Court has consistently held that claims of ineffective assistance of counsel are not cognizable during post-trial proceedings, including the [Post Conviction Relief Act[15]], when the claimant has previously insisted on self-representation. *Commonwealth v. Sims*, 379 Pa.Super. 252, 549 A.2d 1280 (1988), *allocatur denied*, 521 Pa. 630, 558 A.2d 532 (1989); *Commonwealth v. Glessner*, 337 Pa.Super. 140, 486 A.2d 521 (1985); *Commonwealth v. Andrews*, 282 Pa.Super. 115, 422 A.2d 855 (1980). Having knowingly and voluntarily waived the right to counsel, an appellant is not permitted to "rely upon his own lack of legal expertise as a

---

15. The Post Conviction Hearing Act (PCHA) was the predecessor to the PCRA. The PCHA was repealed and replaced by the PCRA on April 13, 1988.

ground for a new trial." *Commonwealth v. Celijewski,* 324 Pa.Super. 185, 190, 471 A.2d 525, 528 (1984).

For example, in *Commonwealth v. Sims,* 379 Pa.Super. 252, 549 A.2d 1280 (1988), the defendant acted as his own counsel during trial, with stand-by counsel available for consultation. The defendant appealed from an order denying relief under the PCHA asserting, among other things, ineffective assistance of counsel. The Superior Court refused "to address appellant's assertion that stand-by counsel was ineffective. Appellant cannot shift the responsibility for his performance to stand-by counsel." *Sims,* 379 Pa.Super. at 257, 549 A.2d at 1282.

\* \* \* \* \* \*

We see no reason not to adopt the Superior Court's disposition of this issue as our own. Furthermore, we see no distinction, and today do not choose to define one, which would permit a different policy for judgements of sentence imposing the death penalty.

The law is therefore clear that Appel is not entitled to relief based on his claims of ineffectiveness of stand-by counsel.

Appel nevertheless maintains that his Sixth Amendment right to counsel took effect when he first entered court, and argues that his court-appointed stand-by lawyers were ineffective during the period beginning when he first requested to waive counsel until the trial court accepted his waiver. Although Appel's self-representation precludes post-trial relief based on a claim of ineffective assistance of counsel, we will nevertheless discuss his ineffectiveness claims because of the irrevocable nature of the death penalty.

Ineffective assistance of counsel provides a basis for relief under the PCRA only when it "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). To warrant relief, a defendant must prove that the underlying claim is of arguable merit, counsel had no reasonable basis for the act or omission in question, and but for counsel's act or omission, the outcome of the proceedings

would have been different. *Commonwealth v. Douglas,* 537 Pa. 588, 645 A.2d 226 (1994), *citing Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

First, we must examine whether Appel's claim of ineffective assistance of stand-by counsel has arguable merit. Both of Appel's stand-by attorneys, Ellen Kraft, Esquire, and Lorenzo W. Crowe, Esquire, testified at the PCRA hearing. Kraft stated that when she and Crowe first met Appel in prison, he told them that he did not them her to represent him. He said that the only reason that he had requested a public defender was so that he could get visiting privileges and have communication with people outside the prison. He also told them that he did not want to fight the charges or mount a defense, and wanted the trial court to impose the death penalty.

Kraft testified that they met with Appel frequently, almost daily, up to the competency hearing and on a weekly basis after that. Both attorneys repeatedly spoke to Appel about the death penalty, and Kraft testified that Appel was extremely well informed about the legal system and the charges against him.[16] She assisted Appel with non-legal matters such as paying bills from prison, including a bill for his girlfriend's furniture, and his life insurance premium. Kraft explained that Appel specifically directed his attorneys not to contact his girlfriend or family, and insisted that stand-by counsel were not his attorneys.

Appel told them that his decision to plead guilty was a "glimmer of honor in a terribly dishonorable act," and he did not want them to interfere with the legal process because he was adamant that he wanted the trial court to impose the

**16.** According to Kraft, Appel was:

"extremely knowledgeable probably more so than half of the defense attorneys I have met, as to the legal system, as to the charges against him, as to the various—he educated us, in terms of what he had done. And in specific about the criminal process and the criminal procedure and what happened at the preliminary hearing, what happened at the search and seizure of evidence at the trailer."

Notes of testimony, May 12, 1995, p. 151. This testimony is highly probative evidence because it directly pertains to Appel's ability to "understand the nature or object of the proceedings against him or to participate in his defense." 50 P.S. § 7402.

death penalty. According to Kraft, Appel nevertheless argued the existence of two mitigating circumstances at the penalty phase hearing because he wanted to underscore that he understood the court proceedings and wanted it to appear that he was acting in the same way that an attorney representing him would have acted. Attorney Crowe essentially corroborated Kraft's testimony.

The record establishes that from the moment that he first met the two attorneys appointed to represent him, Appel refused their representation. Appel's stand-by counsel were faced with a client who insisted that he was competent, refused legal counsel, and was later adjudicated to be competent. Nevertheless, stand-by counsel secured the services of a psychologist, Dolores Kristofits, to perform a battery of psychological studies on Appel to determine his "personality, background, and makeup." Notes of testimony, May 9, 1995, p. 27. After that, the trial court ordered two psychiatric examinations and both psychiatrists who examined Appel concluded that he was competent.

This case presents a peculiar situation in which a defendant refused counsel, expressly waived his right to counsel after a thorough colloquy, yet nevertheless claims in a PCRA petition nine years later that he is entitled to a new trial because his court appointed stand-by counsel were somehow ineffective. We have held that we will not deem counsel ineffective for respecting his or her client's wishes. *Commonwealth v. Sam,* 535 Pa. 350, 635 A.2d 603 (1993), *cert. denied,* 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994) (where the defendant in a death penalty case directed trial counsel not to prove or argue mitigating factors, trial counsel will not be deemed ineffective because he did not defy the defendant's instruction); *Commonwealth v. Holloway,* 524 Pa. 342, 572 A.2d 687 (1990)(trial counsel is not ineffective for following the defendant's request to limit testimonial evidence of mitigating factors during the penalty phase of first degree murder prosecution).[17]

17. In addition, Rule 1.2 of the Pennsylvania Rules of Professional Conduct provides in pertinent part:

 As we have previously discussed, Appel was competent and it was therefore reasonable for counsel to accept the word of both medical experts and Appel himself and to proceed as he instructed them. We will not adopt a rule that requires stand-by counsel to presume that both their client and the examining psychiatrists are wrong in their competency assessments when all of the available facts suggest that he or she is competent. We reject Appel's argument that stand-by counsel must ignore the pleadings of their criminal defendant clients and undertake an exhaustive survey of the client's personal background in an attempt to establish incompetency. In a case where other facts do not suggest incompetency, we will not impose such a duty upon stand-by defense counsel. When two qualified psychiatrists find a defendant competent, and where the defendant insists he is competent, we will not hold that stand-by counsel should conduct an extensive investigation to uncover evidence of incompetency.

 The mere fact that Appel wanted the trial court to impose the death penalty does not necessarily lead to the conclusion that stand-by counsel should have assumed that he was incompetent. As noted by the trial court, Appel expressed several rational reasons for wanting to die. He said that he preferred the death penalty to life imprisonment; he wanted to keep his girlfriend and parents out of the case and off the witness stand; he wanted to insure that his girlfriend received his life insurance proceeds; he said that he wanted to

(a) A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued. . . . In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.
The Comment to Rule 1.2 provides in pertinent part:
The client has the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations.
The rule and comment to the rule make clear that it is the defendant who decides the objectives of legal representation. Defense counsel may consult with the defendant about the best means by which to pursue the defendant's objectives, but cannot override what the defendant deems to be in his or her best interest. *Sam.*

do the honorable thing and bring some comfort to the families of the victims; and he thought that God might forgive him if he cooperated. Based on the facts of the present case, we find that Appel's allegations of ineffective assistance of counsel do not have arguable merit and do not warrant relief pursuant to the PCRA.

## VI. *Alleged Discovery Violations*

██ After Appel's arrest, Charles Marshall, a state police investigator, interviewed several people familiar with Appel including Appel's girlfriend, Herzog, one of Appel's taxicab customers, and a psychologist who had met Appel several times when Appel came to his office to pick up a friend. Marshall testified at the PCRA hearing that the individuals he spoke to described Appel's strange behavior, and were aware of his unusual ideas, including his beliefs about the military and connections to spy organizations. According to Appel, the Commonwealth had a duty to disclose this information to the defense or to the trial court so that this information could be considered in determining Appel's competency. Appel argues that the Commonwealth's failure to disclose that information violates the rule set forth in the United States Supreme Court's decision in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We do not agree.

██ In *Brady,* the United States Supreme Court held that a prosecutor's suppression of evidence favorable to an accused after a defendant's discovery request violates due process where the evidence is material either to guilt or to punishment, regardless of the good or bad faith of the prosecution. *See accord, Commonwealth v. Powell,* 449 Pa. 126, 295 A.2d 295 (1972). However, the *Brady* rule is not an all-encompassing directive to the prosecution to disclose all evidence in its possession to a criminal defendant. The prosecution is not required under *Brady* to "make a complete and detailed accounting to the defense of all police investigatory work on a case," *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972), nor must the prosecutor "disclose possible theories of the defense to the defendant,"

*United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir. 1988). In explanation of its *Brady* rule, the U.S. Supreme Court has stated that "unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose." *U.S. v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

This Court has recognized several instances where disclosure by the prosecution is mandatory. First, the defendant's right to discovery of information held by the prosecution is set forth in our Rule of Criminal Procedure 305, which provides in relevant part:

> *Mandatory:* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule [pursuant to Pa. R.Crim.P. 305(F) ], the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
>
> (a) Any evidence favorable to the accused which is material either to guilt or to punishment, and which is within the possession or control of the attorney for the Commonwealth.

Pa.R.Crim.P. 305(B)(1)(a). As we have noted in the past, the purpose of our discovery rules is to permit parties in criminal matters to be prepared for trial; trial by ambush is contrary to the spirit and letter of those rules and will not be condoned. *Commonwealth v. Shelton,* 536 Pa. 559, 640 A.2d 892 (1994).

In addition, we have held that where the Commonwealth has in its possession pretrial statements of its witnesses which: (1) have been reduced to writing, (2) relate to the witness' testimony at trial, and (3) are signed, adopted or otherwise shown to be substantially verbatim statements of that witness, the Commonwealth must, if requested, furnish copies of the statements to the defense to allow the defense to prepare for

cross-examination. *Commonwealth v. Brinkley,* 505 Pa. 442, 480 A.2d 980 (1984).

The evidence that is the subject of Appel's alleged *Brady* violation consists of statements, made by people Appel knew and/or came into contact with, describing Appel's behavior. These statements were not relevant to Appel's guilt or innocence, but instead pertained only to Appel's competency, which Appel did not contest. Because Appel was competent during the 1986 court proceedings and chose not to challenge his competency or mount any defense, the Commonwealth was not required to furnish these statements to the defense. Moreover, Appel was aware of his contacts with these people. Therefore, their descriptions of Appel's behavior were not in the control of the prosecution. Accordingly, no relief is due.

### VII. *Reliability of the 1986 Competency Evaluation*

Next, Appel argues that he is entitled to relief from his conviction and sentence because he was not afforded a reliable evaluation of his impaired mental health and competency and was thus deprived of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution. Appel relies upon the United States Supreme Court's decision in *Ake v. Oklahoma,* 470 U.S. 68, 70, 105 S.Ct. 1087, 1090, 84 L.Ed.2d 53 (1985), as his sole authority for the proposition that "the Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition" when the defendant's mental health is at issue. Appel's brief, p. 97. Relying on *Ake,* Appel alleges that Dr. Schwartz did not conduct an appropriate examination or competently provide a competency evaluation and that he is thus entitled to relief.

However, Appel's reliance on *Ake* is misplaced. In *Ake,* the United States Supreme Court stated the following:

The issue in this case is whether the Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effec-

tive defense on his mental condition, when his sanity at the time of the offense is seriously in question.

\*　　\*　　\*　　\*　　\*　　\*

We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake* at 70, 83, 105 S.Ct. at 1089, 1096. The case before us does not involve an insanity defense at trial, but instead, a pretrial determination of competency to stand trial. The process of evaluating competency and an insanity defense involve similar questions regarding the defendant's mental status, but they are nevertheless distinct issues. Here, there was no demonstration that Appel was going to make his sanity, at the time of the offense, an issue at trial. Therefore, the U.S. Supreme Court's holding in *Ake* is not controlling here and no relief is due.

## VIII. *Mental Illness as a Mitigating Factor at Sentencing*

Appel argues that the cumulative effect of three constitutional violations prevented the trial court from giving full consideration and effect to Appel's mental illness before imposing the death sentence. Specifically, Appel alleges that the three constitutional violations were: (1) the ineffective assistance of counsel during the pre-trial period and during the 1986 proceedings; (2) the prosecution's failure to provide exculpatory information under *Brady;* and (3) the allegation that Appel's right to a competent mental health evaluation was violated. According to Appel, each of these alleged violations acted singly and in concert to prevent the trial court from considering Appel's diminished mental capacity as a mitigating factor in determining Appel's sentence. Because we have rejected each of the three alleged constitutional violations, we similarly hold that this argument is without merit.

## IX. *Application of Corpus Delicti Rule to Penalty Phase*

The trial court found the following two aggravating circumstances: (1) that Appel killed the victims to prevent their testimony against him in a criminal proceeding and (2) he committed the killings in the perpetration of a felony. There was one mitigating factor, Appel's lack of a prior record of felony convictions, and the trial court held that the aggravating factors outweighed the mitigating factor pursuant to 42 Pa.C.S. § 9711(c)(1)(iv).[18] Appel now argues that because the only direct evidence of his motivation to kill the victims came from his confession, the trial court's finding of an aggravating factor violates the *corpus delicti* rule.[19] We cannot agree that the doctrine of *corpus delicti* entitles Appel to relief.[20]

It has long been our rule that an extrajudicial admission or confession of an accused cannot be admitted until the *corpus delicti* for a crime has been first established by independent proof. *See, Commonwealth v. Turza*, 340 Pa. 128, 16 A.2d 401 (1940). Further, the *corpus delicti* rule requires that independent evidence establish the commission of the crime. *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258 (1974); *Commonwealth v. Leslie*, 424 Pa. 331, 227 A.2d 900 (1967). We have stated that a *corpus delicti* in a murder prosecution consists of proof that an individual is dead and that the death resulted from criminal means. *Commonwealth v. Tallon*, 478 Pa. 468, 387 A.2d 77 (1978).

18. The verdict must be a sentence of death if the fact finder finds "one or more aggravating factors which outweigh any mitigating circumstances." 42 Pa.C.S. § 9711(c)(1)(iv).

19. In *Appel I*, this Court affirmed the trial court's determination that an aggravating factor existed because the victims were killed for the purpose of preventing their testimony against the defendant in the criminal proceedings involving the offense. We held that Appel's admission that he tried to kill all of the people in the bank so that there would be no potential witnesses against him constituted sufficient direct evidence to establish this aggravating factor.

20. Literally meaning "the body of the crime," *corpus delicti* refers to material proof that a crime has been committed. The *corpus delicti* consists of the occurrence of a loss or injury, and some person's criminal conduct as the source of that loss or injury. *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258 (1974); *Commonwealth v. Leslie*, 424 Pa. 331, 227 A.2d 900 (1967).

Here, Appel admitted to his motivation to kill the victims when he pled guilty. During the guilty plea colloquy, the prosecutor explained that Appel's plan included killing all the people inside the bank so that there would be no living witnesses to later testify against him or his co-defendant. Notes of testimony, July 22, 1986, p. 36. In court, Appel admitted under oath that this was true. *Id.* at 42. We have never applied the *corpus delecti* rule to in-court admissions, and we decline to do so here. Thus, our existing *corpus delicti* rule does not bar a finding of this aggravating circumstance.

## X. *This Court's King's Bench Powers*

Next, Appel requests this Court to exercise our Powers of the King's Bench to repair alleged trial court error and to grant Appel relief. Appel's plea is inappropriate and unnecessary. Our King's Bench powers, preserved in the Schedule to the Article 5, Section 1 of the Pennsylvania Constitution and implemented under Pa.R.A.P. 3309 and 42 Pa.C.S. § 726, are powers of extraordinary jurisdiction. In cases in which we elect to exercise our powers of the King's Bench, our action has the effect of transferring jurisdiction of a matter pending before an inferior court to the jurisdiction of this Court. Our grant is deemed the taking of an appeal as of right. *See generally, Beharry v. Mascara,* 92 Pa.Cmwlth. 484, 499 A.2d 1129 (1985). Because we have already recognized and accepted jurisdiction in this case, and have acted upon that jurisdiction, the assumption of extraordinary jurisdiction under our powers of the King's Bench is neither possible nor necessary.

## XI. *Alleged Inaccuracies in the PCRA Transcript*

Finally, Appel alleges that certain errors in the typewritten transcription of the PCRA hearing preclude an adequate appellate review of the trial court's decision. Appel essentially asks us to stay our appellate review and remand the case to the trial court for the limited purpose of correcting the transcript.

Appel claims that the transcript filed with the Court incorrectly states that one of his expert witnesses, Dr. Merikangas, stated that Appel had an antisocial personality disorder. According to Appel, the witness testified that Appel does *not* have an antisocial personality disorder but is mentally ill. In addition, the transcript indicates that Dr. Merikangas said "no" when asked if Appel's behavior at the time of the offense was affected by his mental illness, when, Appel alleges, the witness actually responded, "It was."

Appel filed three motions with this Court seeking limited remand on this issue on December 1, 1995, February 15, 1996, and February 20, 1996. We have denied Appel's motions seeking limited remand three times. In each instance where Appel has claimed that there was a transcription error, the Commonwealth has stipulated to the correction and this Court has accepted the stipulation. Appel has not pointed out any additional error that undermines our appellate review. Accordingly, Appel is not entitled to a remand for this issue.

## XII. *Conclusion*

For the above reasons, we affirm the Order of the Court of Common Pleas of Northampton County denying Martin D. Appel's Petition for Post–Conviction Relief and direct the Prothonotary of the Supreme Court to transmit the complete record in this case to the Governor pursuant to 42 Pa.C.S. § 9711(i).

CAPPY,J., concurs in the result.