896 A.2d 508

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Anthony FLETCHER, Appellee.**

**Commonwealth of Pennsylvania, Appellee,**

v.

**Anthony Fletcher, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 29, 2005.

Decided April 21, 2006.

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Harrisburg, for Commonwealth of Pennsylvania (in No. 438 CAP).

Kathleen E. Martin, Esq., Jerome J. Shestack, Esq., Joseph Colin Crawford, Esq., Philadelphia, for Anthony Fletcher (in No. 438 CAP).

Kathleen E. Martin, Esq., Jerome J. Shestack, Esq., Philadelphia, for Anthony Fletcher (in No. 446 CAP).

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Harrisburg, for Commonwealth of Pennsylvania (in No. 446 CAP).

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER, and BALDWIN, JJ.

## OPINION

Justice SAYLOR.

In this capital appeal, the Commonwealth challenges the award of a new trial by a post-conviction court deriving from the absence at trial of testimony from the assistant medical examiner who performed the autopsy of the murder victim, as well as a limited retraction by the pathologist who furnished trial testimony at the behest of the prosecution.

The background underlying Appellee's 1993 conviction for first-degree murder and associated death sentence is set forth in *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261 (2000). Briefly, the killing occurred in March 1992, when Appellee approached the victim, Vaughn Christopher, and shot him twice, first in the thigh, and second, and fatally, in the right flank. The Commonwealth presented evidence that the killing was motivated by Mr. Christopher's retention of illegal drugs (and/or proceeds thereof) that had been consigned to him by Appellee for sale. Mr. Christopher was taken to the hospital, where he died during the course of emergency treatment. Apparently, his clothing was discarded or lost at the hospital facility.

Police secured statements from several eyewitnesses, including Ronald Brooks and Natalie Grant, describing the above events and indicating that Appellee approached the victim, produced a handgun, and shot Mr. Christopher in the absence of any physical confrontation or struggle. Upon his apprehension and arrest, Appellee gave a statement to police admitting to his role in the killing, but he contended that he acted in his own defense. According to Appellee's statement, he was angry because Mr. Christopher had stolen money from him in the course of a gambling activity; he approached Mr. Christopher and punched him in the head; Mr. Christopher pulled a pistol; a struggle ensued; and, during the course of this struggle, Appellee placed his hand on the gun and fired twice toward Mr. Christopher's legs.

At the preliminary hearing, the parties stipulated to the overall results of an autopsy performed by Dr. Hydow Park, then of Philadelphia's Office of the Medical Examiner, concluding with the agreement that Dr. Park would be made available at trial. *See* N.T., March 26, 1992, at 4. The Commonwealth also presented Natalie Grant's testimony, which was largely consistent with her statement.

At trial, Ms. Grant again testified that the killing was unprovoked and that Appellee fired from a distance of several

feet as he approached the victim.[1]  She was extensively cross-examined by the defense, *inter alia,* concerning her use of illicit drugs in the overall time period during which the killing occurred;[2] her history of retail theft; her status as a fugitive on account of several bench warrants that were outstanding when she gave her statement to police; and an active prosecution against her cousin, who was a fugitive, for shooting Appellee, in which Appellee was likely to be called as a Commonwealth witness.  The Commonwealth also called Ronald Brooks, who denied that he had furnished an incriminatory statement to police and insisted that he was not present at the scene of the killing; therefore, the Commonwealth presented Brooks' prior inconsistent statement into evidence.  Additionally, Appellee's own statement given during the police interrogation was read to the jurors, and the Commonwealth also offered into evidence substantial testimony from investigating officers describing the overall police investigation.

Finally, the Commonwealth presented evidence associated with the autopsy conducted by Dr. Park. The evidence was not introduced through Dr. Park himself, however, upon the district attorney's representation to the trial court that Dr. Park was unavailable as he was in Africa on a medical mission. Over a defense objection, the Commonwealth introduced opinion testimony from a different pathologist, Dr. Ian Hood, based upon the factual findings in Dr. Park's autopsy report, pursuant to *Commonwealth v. Mitchell,* 391 Pa.Super. 100, 104, 570 A.2d 532, 534 (1990) (indicating that, "[i]n homicide cases, pathologists may base their opinions on facts from autopsy reports prepared by others").

Immediately before Dr. Hood's testimony and pursuant to a stipulation between the parties, passages from Dr. Park's autopsy report were read into the record.  In detailing the fatal wound, the report described the path of the bullet as

1.  In her trial testimony, Ms. Grant described this distance as seven or eight feet. *See* N.T., January 22, 1993, at 10, 56–57. At the preliminary hearing, she testified that the distance was ten to fifteen feet. *See* N.T., March 26, 1992, at 7.

2.  Ms. Grant testified, however, that she was not under the influence of drugs at the time of the killing.

entering Mr. Christopher's right flank thirteen inches below the top of the shoulder along the posterior axillary line (a line running downward from the rear of the armpit) and traveling "leftwards, frontwards and [slightly] upwards." N.T., January 26, 1993, at 13. The report also indicated that the bullet was recovered "from the muscles of the left anterior chest wall beneath the rib cage." *Id.* at 15. Further, the report stated that there was no evidence of close range firing on the skin. *See id.* at 13; *see also id.* at 15 ("The skin around the entrance wound shows no gunpowder stippling or deposits of soot."). With regard to the wound to the victim's right thigh, the report reflected that the bullet entered six inches above the knee, coursed backwards and downwards, and exited four inches above the knee and three inches away from the entrance wound. *See id.* The report also indicated that there was no scalp hemorrhage, but disclosed a three-by-one-inch contusion on the left lower chest. The jurors were also informed that no clothing was submitted to the Office of the Medical Examiner for examination. *See id.* at 18–19.

During the direct examination, Dr. Hood clarified that the fatal bullet entered around the location where the victim's right elbow would ordinarily hang on a line dropping from the back of the armpit. He also explained that:

The bullet actually entered the left chest wall right at the bottom of the rib cage, really at the junction, I guess, of the chest [w]all and the abdominal wall, where I indicated with my hand, which would be in my case wearing a shirt, pretty much right at the bottom of the breast pocket on the left.

N.T., January 26, 1993, at 22. Responsive to inquiries probing whether there was evidence of a struggle, Dr. Hood also highlighted the absence from the report of any suggestion of bruising on the victim's face as follows:

I can state only what is not mentioned in the report. There is no evidence of any abrasion, laceration or bruising. That means scraping of the skin, bruising or laceration. . . . You see that in people who are punched around the eyes. Typically, that would split the skin. None of that was

mentioned as being present on the body and evidence of that was not seen in the photographs of the decedent. N.T., January 26, 1993, at 28. Further, Dr. Hood attributed the bruise on the victim's chest to the fatal bullet. *See id.* at 28 ("[Y]ou can also see a big bruise where the bullet came close to it and entered the left chest wall."). Finally, Dr. Hood testified that the unavailability of the victim's clothing precluded him from rendering an opinion as to the distance from which the victim was shot, as follows:

Given that we [didn't] get the clothing, [the absence of such markings on the skin] doesn't mean much except that it was not a tight contact wound because that would have gone through the clothing, but since we have not get [sic] the clothing for that, that same soot and stippling, it could mean that the gun was anywhere from a few inches to as far away as you like.

N.T., January 26, 1993, at 20.

On cross-examination, Dr. Hood responded to the defense suggestion that the victim could have been struggling with someone at the time that he was shot in the following manner:

I don't think it's probable that the victim had his hands or wrists around the barrel or close to the barrel of the gun when it was fired. I would see no evidence of that. But, I cannot say from the physical evidence that there was any evidence of struggling on the part of the decedent, but it doesn't mean that that didn't occur. He did not seem to have received any blows or struck against something hard, but I cannot say anymore than that.

N.T., January 26, 1993, at 43–44. The cross-examination further proceeded as follows:

Q. You don't know where or how this [fatal gunshot] wound was inflicted. That's the bottom line of your testimony; correct?

A. That's correct. I only know where the victim came from when he was found.

*Id.* at 44.

In closing, the district attorney indicated to the jurors that "[t]he Medical Examiner is absolutely important to this case,

because it refutes the defendant's version of what happened," N.T., January 27, 1993, at 149. Further, he argued:

Dr. Hood said no, there was no evidence of a struggle here, no bruising or anything on any part of the hands or body or most specifically if the victim's hand were on the barrel of the gun at the time it was fired there would be burning, there would be a burn on his hand because of the heat that is established on the gun and it if it [sic] happened like that there would be evidence of it and there is no such evidence in this case.

*Id.* at 156–57.

After the verdict, Appellee's trial counsel filed timely post-verdict motions under former Rule of Criminal Procedure 1123. Appellee sought and obtained multiple substitutions of counsel, culminating with the appointment of Attorney Willis W. Berry, Jr.[3] During this period, Appellee also filed several *pro se* motions seeking an arrest of judgment and/or a new trial. Attorney Berry also filed supplemental post-verdict claims. On April 4, 1995, the post-verdict court conducted a status conference at which Appellee presented a motion to dismiss Attorney Berry and proceed *pro se*. Appellee read his request into the record as follows:

One, Anthony Fletcher, pro se, respectfully requests this Honorable Court to strike the supplemental post-verdict motions and hereby demands the right to proceed pro se as his own attorney as provided for under Pennsylvania Rule of Criminal Procedure 313(c) and the Sixth Amendment of the United States Constitution....

\* \* \*

... [T]his waiver of counsel and this demand to proceed pro se is knowingly, intelligently and voluntarily made with the full understanding of the consequences and potential consequences entitled by virtue of such waiver.

3. Attorney Berry subsequently became a judge of the First Judicial District.

\* \* \*

... [T]he advocate understands that if he waived the right to counsel, he will still be bound by all of the normal rul[es] of procedure and that he firmly agrees with these rules.

\* \* \*

... [T]he advocate understands that there are possible issues to be raised and if these issues are not raised timely, they may be lost permanently.

N.T., April 4, 1995, at 21–25. Appellee also participated in the following interchange with the post-verdict court:

THE COURT: But, you know that if you hurt yourself due to your lack of [ ]knowledge of the law, lack of knowledge of procedure in the field in which you are not educated and trained to participate, if you go forth and you omit things that somebody otherwise trained in the law might have seen, that you cannot later, once a resolution of post-verdict motions has been made, complain about them; do you understand?

[APPELLEE]: Yes, sir.

THE COURT: So, if you goof on your own, you cannot claim ineffectiveness of counsel. Do you understand?

[APPELLEE]: Yes, sir.

N.T., April 4, 1995, at 27. Thereafter, the court granted Appellee's request to proceed *pro se* and designated Attorney Berry as standby counsel, describing his role as follows:

[Counsel] is directed to advise Mr. Fletcher in every way he knows how concerning his claims, the pertinent legal principles and the pertinent procedure relevant in this case, but we will permit Mr. Fletcher to file supplemental post-verdict motions in his own behalf and will permit him to present oral argument[.]

N.T., April 4, 1995, at 28.

After transcription of the notes of testimony, Appellee and Attorney Berry filed several supplemental post-verdict motions, and a hearing ensued. Attorney Berry was later per-

mitted to withdraw, and the post-verdict motions were denied upon the court's consideration of the claims that had been asserted.[4]  New counsel was then appointed to pursue the appellate avenue for relief.

In the direct appeal that followed, this Court affirmed Appellee's conviction and sentence. *See Fletcher*, 561 Pa. at 266, 750 A.2d at 261.  The United States Supreme Court also denied his request for certiorari. *See Fletcher v. Pennsylvania*, 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000) (*per curiam*).

Subsequently, Appellee filed a timely petition for relief under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9547 (the "PCRA"), advancing as his lead claim a contention that his trial counsel provided constitutionally deficient stewardship in failing to secure exculpatory testimony from Dr. Park at trial.[5]  The claim was framed on the understanding that the central question at trial in determining Appellee's guilt was whether he shot Mr. Christopher from several yards away or in the course of a struggle.  Citing to the district attorney's closing remarks and the credibility issues raised by the defense at trial concerning the eyewitness testimony, the petition indicated that evidence from the autopsy played a critical role at trial in establishing how the shooting occurred.  The petition alleged that trial counsel never interviewed Dr. Park and, had he done so, he would have learned that, in Dr. Park's view: the Commonwealth's version of the shooting was highly unlikely, while in contrast, Appellee's account was likely and consistent with Mr. Christopher's wounds as well as other evidence;  the wound to Mr. Christopher's thigh evidenced a bullet trajectory that was sharply downward, making it unlikely that the shooter was several yards away as Ms. Grant had

4.  At the hearing on post-verdict motions, Appellee had expressed a desire to file additional claims, which the court did not permit.  *See* N.T., December 12, 1995, at 86–87.

5.  As noted, the PCRA court's analysis focused on trial counsel's stewardship; as further developed below, the court did not structure its opinion according to the framework applicable to layered ineffectiveness claims as delineated in *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003).

testified; the bruise on the left side of Mr. Christopher's body was not caused by the bullet traveling internally through his body, but instead was produced by a blunt external impact to the chest; the bruise was consistent with a struggle, and specifically, could have been caused by either a fist or elbow; because the skin on the sides of the head and at the scalp is very dense and tough and bruises less easily than skin on many other parts of the body, no forensic pathologist could draw a reliable conclusion from the absence of bruising as to whether the victim had been stricken on the side of the head; and the lack of markings on Mr. Christopher's hands did not in any way contradict Appellee's account that shots were delivered while he and the decedent were fighting over the gun, because contact with or proximity to a discharging handgun would not ordinarily leave any detectable markings, and Mr. Christopher underwent a substantial course of emergency medical treatment, during which his hands could have been cleaned. Appellee attached to the petition a declaration from Dr. Park supporting the above-described averments.

Further, Appellee included a declaration from Dr. Hood, indicating, *inter alia*, that he wished to retract his trial testimony to the effect that the bruise on the victim's chest was caused by the bullet that entered the victim's flank. The declaration also stated:

> At the request of [Appellee's] post-conviction counsel, I have reexamined both Dr. Park's report and the pictures from [the Office of the Medical Examiner's] file of the body of Vaughn Christopher. Based on the description in Dr. Park's report of the bullet's pathway through [Mr.] Christopher's body, and my knowledge of anatomy, I now conclude that the bullet came to rest at a point about three inches below the bruise on the left side of [Mr.] Christopher's chest, so I do not believe that the bullet could have caused the bruise. The bullet would have had to enter the chest cavity to cause the bruise and, according to Dr. Park's report, it did not.

In the declaration, Dr. Hood also opined that the bruise was most likely inflicted contemporaneous with the bullet wounds,

was most likely caused by a blunt impact to the chest, and could have been inflicted by a fist or elbow in the midst of a struggle. Thus, Dr. Hood also expressed a desire to retract his trial testimony to the effect that there was no evidence noted in Dr. Park's autopsy report of a struggle.

Additionally, Appellee attached a declaration from his trial counsel indicating that he did not interview Dr. Park in advance of trial and had no tactical reason for having failed to do so. Counsel also declared that had he known of Dr. Park's favorable opinion, he would have objected to Dr. Hood's testimony and sought a continuance.

The PCRA court proceeded to conduct a limited evidentiary hearing, focusing, *inter alia,* on the allegation of ineffectiveness associated with the failure to present testimony from Dr. Park. Consistent with his declaration, Appellee's trial counsel testified that he did not attempt to contact Dr. Park in advance of trial, and if he had been aware of the pathologist's opinions as expressed in his declaration, he would have demanded his presence at trial. Counsel also testified that he had no strategic or tactical reason for the omissions in these regards. *See* N.T., September 4, 2003, at 72. Further, Attorney Berry also testified that he gave no consideration to interviewing Dr. Park, did no investigation into whether a pathologist could refute the prosecution's account of the killing or support Appellee's account, and had no strategic reason for such omissions. *See* N.T., September 8, 2003, at 28–30. Appellee's appellate counsel testified that he limited his review to the trial record, and he did not investigate any aspect of Dr. Hood's trial testimony or otherwise consider whether Dr. Park or any other pathologist should have been interviewed or called as a witness. *See* N.T., September 16, 2003, at 59–61.

In his direct examination, Dr. Park provided testimony that was largely consistent with his declaration, continuing to characterize the Commonwealth's account of the shooting as "very unlikely," based on his assessment of the gunshot wounds. *See, e.g.,* N.T., September 4, 2003, at 194. Additionally, Dr. Park confirmed that, although he was in Africa throughout much of the trial, he remained in the United

States and was available to testify during the first two days. *See id.* at 170.

During cross-examination, the district attorney developed that Dr. Park's performance as a pathologist had been deemed unacceptable by his supervisors, and that he had lodged a grievance and ultimately resigned from the Office of the Medical Examiner. *See* N.T. September 4, 2003, at 138–39, 148, 231–32.[6] The Commonwealth confronted Dr. Park with several specific examples of asserted incompetence on his part, some of which Dr. Park did not remember, and others of which he dismissed as relatively inconsequential. *See id.* at 157–62. The district attorney also: noted the passage of nine years between the autopsy and the post-conviction declaration; pointed out that Dr. Park had received letters from Appellee, at least one of which appeared to be threatening;[7] identified discrepancies between Dr. Park's autopsy report and his post-conviction declaration, such as a one-quarter inch discrepancy in describing the size of one of the bullet wounds;[8] and obtained concessions from Dr. Park that the pictures of the victim's thigh wound suggested that the bullet path was more horizontal than angled and that the Commonwealth's account of the killing was possible. *See id.* at 195–207. Finally, the Commonwealth highlighted the inconsistency between Appellee's statement to police that he shot toward Mr. Christopher's legs, and the "frontward and upwards" trajectory of the fatal bullet entering the victim's right flank as reflected on the face of the autopsy report. *See id.* at 221–22.

Dr. Hood, for his part, testified, consistent with his declaration, that he wished to retract his trial testimony that the

**6.** In response, Dr. Park expressed his belief that his disfavor resulted from his neutrality, whereas other assistant medical examiners "were really Commonwealth oriented." *See id.* at 155–56.

**7.** This letter stated: "Please be advised that I have contacted many concerned people about this matter which through them I was told to try and work this out with you again before they step in and handle things differently,. . . ." N.T., September 4, 2003, at 201.

**8.** Dr. Park's autopsy report indicated that the opening was three-eights inches in diameter; his declaration described the diameter as five-eights inches.

bruise on Mr. Christopher's chest was due to a bullet and that there was no evidence of a struggle. *See* N.T., September 5, 2003, at 52, 59–60. He explained that there was an ambiguity within the statement in Dr. Park's report to the effect that the bullet entering the victim's flank came to rest "beneath" the ribcage, as this could mean either in the direction of the feet ·or the back. *See id.* at 54–55. Further, he stated that, upon reexamination of Dr. Park's report and the photographs of the victim's body, he concluded that the bullet came to rest three inches below the bruise, did not enter the chest cavity, and therefore, could not have caused the bruise. Dr. Hood said that Dr. Park's autopsy report did not refute Appellee's account of the killing. *See id.* at 79. In this regard, he also testified that the district attorney's statement to the jury at trial that his testimony was important because it refuted what Appellee had said was inaccurate. *See id.* at 79–80.

On cross-examination, Dr. Hood acknowledged that his present opinions were contingent upon Dr. Park's post-conviction statements and testimony, since Dr. Park was in the best position to make the assessment, as he had performed the actual autopsy. *See, e.g.,* N.T., September 5, 2003, at 103–04. Dr. Hood also expressed the view that the wound to Mr. Christopher's thigh was not steep, as it was characterized by Dr. Park, and that the flank wound was consistent with the victim's turning and attempting to flee. *See id.* at 131. Dr. Hood also opined that the firearm could not have been pointed downward for both shots, as Appellee had indicated in his statement to police. *See id.* at 131. Finally, Dr. Hood asserted that, although Dr. Park was meticulous in his work, he sometimes became confused in complex cases, which was among the reasons why he was asked to leave the Philadelphia Office of the Medical Examiner. *See id.* at 132–37.

The Commonwealth presented, *inter alia,* testimony from two pathologists, including Philadelphia's Medical Examiner, indicating that the gunshot wound to the victim's right flank most likely caused the bruise on his chest. *See* N.T., September 5, 2003, at 23–24, 157.

After the hearing, the PCRA court granted relief on the claim of ineffective assistance of trial counsel and issued an order vacating the sentence of death and awarding Appellee a new trial. In setting forth the relevant facts, the PCRA court focused on the dispute as to the source of the bruise on Mr. Christopher's chest.[9] At the outset of its analysis, the PCRA court stated that, as the present case is a capital one, it would consider the interests of justice in equal measure with the applicable law. *See Commonwealth v. Fletcher,* Nos. 6001–6004 March Term 1992, *slip op.,* at 5 (C.P. Phila. June 9, 2004).

■ The court then expressed the view that Appellee "was sentenced to death primarily based upon evidence that has since been retracted by the Office of the Medical Examiner." *Id.* The court explained:

Eye-witness testimony was also provided by Natalie Grant, an admitted crack addict who was a fugitive on six outstanding bench warrants when she first gave her statement accusing [Appellee], over three weeks after the shooting occurred. Her credibility as an eyewitness was clearly an issue. It is obvious that Dr. Hood's claim that no physical evidence of a struggle existed was essential to the jury's finding the shooting did not occur in self-defense.

*Id.* at 5. The PCRA court also stressed the importance that the district attorney ascribed to Dr. Hood's testimony. *Id.* at 5–6, 11 (explaining that "the Commonwealth re-emphasized the lack of evidence of a struggle in its closing arguments [and] is therefore hard-pressed to allege the presentation of this faulty evidence of Dr. Hood and the lack of evidence by Dr. Park did not constitute prejudice to the defense"). Placing its conclusion in terms of the three-part standard pertaining to ineffectiveness claims,[10] the court further reasoned:

9. Notably, as further developed below, the court did not address other significant controversies arising from the pathologists' testimony, including that associated with the angle of the bullet wound to Mr. Christopher's leg.

10. Claims of constitutionally deficient stewardship of trial counsel are assessed according to the well established criteria of arguable merit,

Dr. Hydow Park (who obviously existed) was available and willing to testify at trial. Dr. Park testified at the Evidentiary Hearing that he was in the country and available to testify in the trial of [Appellee] on January 19th and 20th, 1993. Trial counsel knew or should have known of the existence of Dr. Park and the evidence Dr. Park testified to at the Evidentiary Hearing. Dr. Park signed the autopsy report received by trial counsel, who should have known the evidence surrounding the alleged struggle[ ] was critical to the defense's case. Here, the jury relied on the eyewitness testimony of an eyewitness, Ms. Natalie Grant, to find beyond a reasonable doubt that [Appellee] was guilty of an execution-style shooting. Further, Dr. Hood erroneously testified at the trial that there was no evidence of a struggle, ruling out the possibility of self-defense. Since Dr. Park, who actually performed the autopsy would have stated that he could not rule out a struggle based on his medical findings concerning the victim, there is a reasonable probability that the jury would not have convicted [Appellee] had they heard the testimony of Dr. Park. Finally, trial counsel was not able to effectively cross-examine Dr. Hood, the substitute expert regarding these issues since Dr. Hood was not even aware that his own conclusions were erroneous. . . .

\* \* \*

The issue of whether evidence of self-defense existed went to the heart of the defense's theory of the case, and was relevant to rebut the Commonwealth's allegations that no self-defense evidence existed. Second, trial counsel admitted he had no reasonable basis for failing to call an expert to support his own theory of the case or to rebut the Commonwealth's evidence. Finally, trial counsel's failure to call Dr. Park clearly worked to [Appellee's] detriment, since the jury obviously believed the Commonwealth's evidence that

absence of reasonable strategy, and prejudice, in terms of whether the petitioner has shown that demonstrated ineffectiveness sufficiently undermines confidence in the verdict. *See Commonwealth v. Pierce,* 515 Pa. 153, 158–60, 527 A.2d 973, 975–76 (1987).

no evidence of a struggle existed, and therefore, self-defense was not likely.

\* \* \*

Having heard the retraction of Dr. Hood's trial testimony and his subsequent opinions, and the evidence Dr. Park would have presented at trial, this court is convinced that this defendant was in fact prejudiced by his trial and appellate counsel's failure to present the expert testimony of Dr. Park, a known expert witness who could have given an accurate assessment of the autopsy.

*Fletcher,* Nos. 6001–6004 March Term 1992, *slip op.,* at 7–8 (citations omitted); *see also id.* at 11 ("Dr. Hood's testimony established a lack of evidence of a struggle based on scientific evidence and analysis and completely ruled out the defense's version of events.").

Finally, answering the Commonwealth's contention that the issue of trial counsel's ineffectiveness was waived because Appellee proceeded *pro se* on post-verdict motions, the court again referenced the interests of justice and reasoned that the PCRA petition should not be denied on account of a technicality or procedural mistake. *See id.* at 8–9. Further, the court found that, under *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), the claim was not waived. *See Fletcher,* Nos. 6001–6004 March Term 1992, *slip op.,* at 10 ("The Supreme Court of Pennsylvania has indicated that the PCRA petition is the appropriate time to raise claims of Ineffective Assistance of Counsel."). The court also stated that, although Appellee filed post-trial motions *pro se,* he was represented by Attorney Berry in pursuing them, and, in this circumstance, there was no waiver. *See id.* at 10.

■ The Commonwealth filed the present appeal, and Appellee filed a protective cross-appeal challenging the denial of relief on his other claims. Our review is centered on whether the findings of the post-conviction court are supported by the record and are free from legal error. *See Commonwealth v. Reyes,* 582 Pa. 317, 325 n. 2, 870 A.2d 888, 893 n. 2 (2005).

Presently, the Commonwealth continues to advocate a disposition based on waiver, arguing that Appellee's claim of ineffective assistance of trial counsel is no longer available under this Court's decisions, because: such claim was not raised in post-verdict motions or on direct appeal, *see, e.g., Commonwealth v. Uderra,* 580 Pa. 492, 500–01, 862 A.2d 74, 79 (2004) (explaining that "most claims arising out of a trial (including claims of trial court error and ineffective assistance of trial counsel) are waived if not raised and preserved at the time of trial and/or in the direct appeal"); the only potential remaining claim would have been a derivative one arising from the stewardship of succeeding counsel, *see id.;* but, since Appellee represented himself at the post-verdict stage and cannot raise his own ineffectiveness, *see, e.g., Commonwealth v. Bryant,* 579 Pa. 119, 136–37, 855 A.2d 726, 736–37 (2004); *Commonwealth v. Appel,* 547 Pa. 171, 198–99, 689 A.2d 891, 904–05 (1997), the device of layering is unavailable to him. On this point, the Commonwealth also references decisions of this Court for the proposition that the appointment of standby counsel does not relieve a *pro se* defendant from waiver of claims attending the defendant's failure to present them during a period of self-representation. *See Bryant,* 579 Pa. at 136–38, 855 A.2d at 737 (treating claims of ineffective assistance of standby counsel as unavailable); *Appel,* 547 Pa. at 198–99, 689 A.2d at 904–05 (same); *Commonwealth v. Griffin,* 537 Pa. 447, 454–56, 644 A.2d 1167, 1170–71 (1994) (same). The Commonwealth also observes that the PCRA court's reliance on *Grant* in this pre-*Grant* case is anomalous, since *Grant* by its express terms was not made applicable to cases, such as this one, that had reached the collateral review stage. *See Grant,* 572 Pa. at 67–69 & n. 16, 813 A.2d at 738–39 & n. 16 ("Our decision today has no effect on cases currently pending on collateral review."). Additionally, the Commonwealth asserts that the PCRA court's treatment of the waiver doctrine as a mere technicality, as well as its failure to recognize that a claim of ineffective assistance of trial counsel was not directly available to Appellee, are contrary to legion decisions of this Court. *See, e.g., Commonwealth v. Jones,* 571 Pa. 112, 128, 811 A.2d 994, 1003 (2002) ("The relaxed waiver

rule ... is not available upon PCRA appeal."); *McGill*, 574 Pa. at 586, 832 A.2d at 1021–22 (explaining that, where a claim of ineffective assistance of trial counsel is not raised by substitute counsel on direct appeal in a pre-*Grant* case, the only extant claim is an attack on appellate counsel's stewardship).

To the extent that the stewardship of Attorney Berry as standby post-verdict counsel and/or of Appellee's appellate counsel is relevant,[11] the Commonwealth advances the position that the record does not support a finding of deficient stewardship, since counsel testified that they had no reason to suspect that Dr. Park would have had an opinion that was not disclosed in his report and that was markedly different than that of Dr. Hood. *See, e.g.,* N.T., September 8, 2003, at 43, 47–49 (reflecting Attorney Berry's testimony that he had no knowledge of Dr. Park's opinions expressed on the post-conviction record and "could see no reason to go and talk to the medical examiner ... from reading the trial transcript"). As to trial counsel, the Commonwealth notes that, prior to Dr. Hood's testimony, counsel reviewed the autopsy report and slides with him. The Commonwealth also points to evidence that it is not unusual for an assistant medical examiner other than the pathologist who performed an autopsy to furnish trial testimony, *see id.* at 28–29, and reiterates that the practice has been met with approval by the courts. According to the Commonwealth, the PCRA court's ruling was driven by hindsight and is detached from a proper perspective concerning counsel's performance in the circumstances in which it was rendered.

On the specific point on which the PCRA court granted relief (namely, the post-conviction evidence concerning the source of the bruise to Mr. Christopher's chest), the Commonwealth catalogues the substantial evidence that it proffered on the post-conviction record supporting Dr. Hood's opinion expressed at trial that the bullet entering the victim's flank

11. Again, the Commonwealth repeatedly emphasizes that, given the PCRA court's approach centered almost entirely on the stewardship of trial counsel, the court made no particularized findings in this regard.

caused the bruise. To the extent that there is uncertainty in this regard in light of the post-conviction testimony of Drs. Park and Hood, the Commonwealth views such uncertainty as of little significance, since mere ambiguity as to source does not prove that the bruise resulted from an actual struggle as Appellee claims; rather, the bruise could have been caused by a number of other known circumstances, including the victim's collapse against a vehicle and ultimately to the ground after having been shot, as well as the emergency medical treatment that was administered in an effort to save his life. *See generally* N.T., September 5, 2003, at 120–21 (reflecting Dr. Hood's post-conviction testimony that the bruise could have been caused by "[j]ust about any blunt impact"). The Commonwealth thus asserts that the opinion testimony concerning the bruise was not meaningful in terms of the jurors' central assessment of the credibility of the eyewitness accounts that Appellee, without provocation, shot the victim in a dispute over drug proceeds. Along these lines, the Commonwealth argues that the post-conviction judge, who was not the trial judge, vastly overstated the significance of evidence concerning the bruise via indications that Dr. Hood's testimony on the issue was "essential to the verdict," "rul[ed] out the possibility of self-defense," and "completely rule[d] out the defendant's version of events," *Fletcher*, Nos. 6001–6004 March Term 1992, *slip op.*, at 5, 7, 11. In this regard, the Commonwealth points to Dr. Hood's testimony at trial that, although he saw no evidence of a struggle, "it doesn't mean that [a struggle] didn't occur." N.T., January 26, 1993, at 43–44.

Finally, the Commonwealth criticizes the PCRA court's approach to its reviewing role, contending that the court applied a personalized standard instead of that which has been approved by this Court, as evidenced by the court's indications that "death is different," and that it would consider the interests of justice in equal measure to the prevailing statutes and standards of law governing the availability of post-conviction relief.

Like the Commonwealth's approach to the waiver question, Appellee's response is multi-faceted. First, Appellee contends

that, since at the time of trial and the litigation of the post-verdict motions and the direct appeal, this Court maintained a policy of relaxed waiver, *see generally Freeman*, 573 Pa. 532, 545–65, 827 A.2d 385, 393–405 (2003) (describing the practice of relaxed waiver), appellate counsel was not restricted to pursuing issues raised on post-verdict motions. Thus, according to Appellee, "whatever happened post-verdict," appellate counsel should have raised any and all issues that would yield relief from the conviction and/or sentence of death. While recognizing that this Court subsequently foreclosed resort to relaxed waiver in the post-conviction context, *see Commonwealth v. Albrecht*, 554 Pa. 31, 44–45, 720 A.2d 693, 700 (1998), Appellee views this change as irrelevant to the evaluation of appellate counsel's performance, because "[t]he reasonableness of counsel's performance is to be evaluated from counsel's perspective *at the time of the alleged error* [.]" *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986) (emphasis added).

Concerning the effect of the *Grant* decision, Appellee acknowledges that *Grant* is not directly applicable in this case, because Appellee's direct appeal was completed at the time that *Grant* was decided. *Accord Grant*, 572 Pa. at 67–68, 813 A.2d at 738 ("The rule we announce today will be applied to the parties before us as well as to any other cases on direct appeal where the issue of ineffectiveness was properly raised and preserved."). Appellee contends, however, that *Grant's* rationale applies and compels a finding of no waiver, since *Grant* was based on "impracticabilities" and "difficulties" confronting petitioners and courts in the application of the previously-prevailing approach under *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977). *See, e.g., Grant*, 572 Pa. at 59, 66, 813 A.2d at 733, 737.

Appellee also supports the PCRA court's determination that he did not waive issues by failing to raise them during the period of his self-representation in the litigation of post-verdict motions, because such *pro se* actions were not "the type of self-representation that precludes future claims of ineffective counsel." *Fletcher*, Nos. 6001–6004 March Term

1992, *slip op.*, at 10. Invoking the tenet that courts should indulge every reasonable presumption against the waiver of counsel, *see Commonwealth v. Bryant*, 579 Pa. at 139, 855 A.2d at 738 (citing, *inter alia, Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)), Appellee references portions of the record in which the post-verdict court characterized Attorney Berry as "principal counsel" and Appellee's own arguments as supplemental, *see* N.T., April 4, 1995, at 20, and refused to permit Appellee to shepherd the actual oral and evidentiary presentation on post-verdict motions. *See, e.g.*, N.T., December 12, 1995, at 44 (reflecting various strong admonishments of the post-verdict court directed to Appellee during the post-verdict hearing, including the following: "Shut up or I'll get you gagged and what do you call tied in here.... There isn't no way over my dead body that you are going to run this show."). Although Appellee recognizes that the post-verdict court repeatedly referred to Attorney Berry as standby counsel, he contends that this does not alter the substance in fact of the arrangement.

On the merits, Appellee contends that the PCRA court's award of relief is consistent with the law and supported by the evidence. Where, as in this case, there is a key factual dispute as to how a killing occurred, Appellee argues that the medical evidence is critically important and requires thorough investigation. In this regard, Appellee contrasts the Commonwealth's present effort to minimize the significance of Dr. Hood's trial testimony with the prosecutor's forceful emphasis on such testimony at trial. *See, e.g.*, N.T., January 27, 1993, at 149 (reflecting the district attorney's remarks to the jury that: "The Medical Examiner is absolutely important to this case, because it refutes the defendant's version of what happened. The defendant's story. It is important."). Appellee also highlights the substantial deference owed by an appellate court to a PCRA court's findings and resolution of credibility disputes. Further, he refutes the Commonwealth's position that the PCRA court applied a personalized standard to the case because it is a capital one; rather, Appellee contends that the court merely recognized that the "duty to search for

constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley,* 514 U.S. 419, 422, 115 S.Ct. 1555, 1560, 131 L.Ed.2d 490 (1995) (quoting *Burger v. Kemp,* 483 U.S. 776, 785, 107 S.Ct. 3114, 3121, 97 L.Ed.2d 638 (1987)).

Finally, Appellee presents argumentation concerning his protective cross-appeal. With regard to most of the issues, Appellee recognizes that, if the Commonwealth prevails in its appeal, the most appropriate course would be for this Court to remand to the PCRA court for an opinion explaining the bases for its resolution of the remaining claims, since the opinion that the court issued is centered on the single claim upon which relief was granted.

Upon our review of the arguments, the PCRA court's opinion, and the record, we agree with a number of the Commonwealth's central contentions. In the first instance, the PCRA court's opinion is facially deficient to the degree that it: maintains only a minimal focus on the stewardship of appellate counsel, since, under prevailing law, the claim of ineffective assistance of appellate counsel is the only potentially extant claim, *see McGill,* 574 Pa. at 587–89, 832 A.2d at 1022–23; relies on *Grant* to address the waiver issue in a pre-*Grant* case; and treats the waiver doctrine as a technicality subject to *ad hoc,* discretionary non-adherence.

On the waiver question specifically, we do not find Appellee's arguments to be unreasoned, but they are in irreconcilable tension with prior decisions of the Court. The argument that *Grant's* reasoning compels relaxation of waiver principles in pre-*Grant* cases conflicts with the majority decision in *Grant* itself, which expressly delineated that there was to be "no effect on cases currently pending on collateral review." *Grant,* 572 Pa. at 69 n. 16, 813 A.2d at 738–39 n. 16. The position that a claim of appellate counsel's ineffectiveness may be utilized as a vehicle to overcome a *pro se* defendant's own waiver of claims of ineffective assistance of trial counsel based upon the availability of relaxed waiver has been rejected on the basis that its implementation would undermine *Al-*

*brecht.* *See Commonwealth v. Tilley,* 566 Pa. 312, 320–21, 780 A.2d 649, 654 (2001); *see also Griffin,* 537 Pa. at 456, 644 A.2d at 1169–71 (enforcing waiver relative to claims that a capital litigant failed to include in *pro se* post-verdict motions, and indicating that "we see no distinction . . . which would permit a different policy for judgments of sentence imposing the death penalty").[12] Further, we do not agree with Appellee's contention that the post-verdict court did not in fact permit Appellee to proceed *pro se* or treat Attorney Berry as standby counsel in the relevant time period during the post-verdict proceedings. As the Commonwealth stresses, upon Appellee's expression of his desire to proceed *pro se,* the post-verdict court conducted a full colloquy during which Appellee was advised of his right to be represented by an attorney and accepted the consequences of a waiver of this entitlement, including the surrender of the ability later to assert claims of deficient stewardship. Further, there is no evidence that the court impeded Appellee in any way in terms of the scope of the numerous claims that he subsequently asserted in supplemental post-verdict filings. Appellee's reliance on the post-verdict court's characterization of Attorney Berry as his "principal counsel" is inapt, as the reference occurred prior to Appellee's actual waiver of counsel and during the course of the court's initial attempts to dissuade Appellee from pursuing a course of self-representation. *See* N.T., April 4, 1995, at 20. While Appellee is correct that the court did limit Appellee's participation at the actual hearing, there is no evidence that this limitation had any effect on the scope of the claims that were properly before the court at the time, as determined by Appellee's supplemental post-verdict pleadings. Thus, con-

---

12. While this author has in the past noted the prudential roots of the waiver doctrine and advocated some flexibility, *see, e.g., Commonwealth v. Hess,* 570 Pa. 610, 622, 810 A.2d 1249, 1256–57 (2002) (Saylor, J., concurring), and further questioned the retroactive abolition of relaxed waiver in capital cases, *see Commonwealth v. Ford,* 570 Pa. 378, 397–400, 809 A.2d 325, 337–38 (2002) (Saylor, J., concurring), the prevailing majority decisions of the Court have strictly enforced waiver in capital and other post-conviction litigation in the post-*Albrecht* period and have maintained *Albrecht's* retroactive application. *See, e.g., Commonwealth v. Brown,* 582 Pa. 461, 470–73, 872 A.2d 1139, 1144–45 (2005).

trary to the PCRA court's conclusion, and in light of Appellee's explicit waiver, which he does not now claim was unknowingly or involuntarily entered, we conclude that Appellee's *pro se* actions precluded future claims of ineffective assistance of trial counsel.[13]

In any event, we agree with the Commonwealth's position that Appellee failed to establish prejudice (as an essential prerequisite to relief under ineffectiveness theory, *see supra* note 10) associated with the stated basis of the PCRA court's disposition, namely, the post-conviction testimony of Drs. Park and Hood concerning the source of the bruise on Mr. Christopher's chest. As the Commonwealth develops, even if it is accepted that the fatal bullet did not cause the bruise to the victim's chest, there were several other likely causes (for example, the victim's multiple falls or the emergency medical treatment), other than a struggle between Appellee and the victim. Furthermore, the core evidence that there was in fact a struggle derived from Appellee's statement to police upon his arrest, a context in which exculpatory statements shifting and spreading blame are often viewed with skepticism, as self-serving and unreliable.[14] The evidence thus

13. This author has taken the position applied by a number of other courts that a post-conviction petitioner should be permitted to challenge standby counsel's stewardship relative to the limited duties that were assigned to him. *See Bryant*, 579 Pa. at 162–63, 855 A.2d at 751–52 (Saylor, J., dissenting). The *Bryant* majority, however, implemented a categorical approach in refusing to consider any claims of ineffectiveness arising from a period of self-representation, *see id.* at 138, 855 A.2d at 737, which we also apply here, based on *Bryant*.

14. Trial counsel's post-conviction declaration and testimony shed some light on this perspective. For example, in discussing his conduct relative to a separate claim, counsel explained:

... I recognized and understood before the trial the extreme difficulty of establishing self-defense and avoiding a conviction of first or third degree murder without having the accused take the stand and explain the facts that would justify a finding of self-defense.

Although [Appellee's] written statement to the police gave me the right to present and argue self-defense, I knew before the trial started that it would be extremely difficult to prevail on self-defense without the defense offering any evidence other than [Appellee's] written statement to the police.

... In view of the extreme difficulty of establishing self-defense based solely on his written statement to the police, I should have told

touched on the critical matter of the credibility of the eyewitnesses only in a substantially indirect fashion. As such, we do not agree with the PCRA court that there is a reasonable probability that a mere indication by a pathologist at trial that the bruise to the victim's chest was not accounted for by the fatal bullet would have been likely to have affected the verdict.[15] While we do recognize Appellee's point that the trial prosecutor overstated the significance of Dr. Hood's testimony in terms of excluding the possibility of a struggle, we note that the trial court instructed the jurors that the attorneys' comments were not evidence, see N.T., January 29, 1993, at 27–28, and moreover, the record reflects that the actual evidence (Dr. Hood's trial testimony) was fairly measured.[16]

With regard to the cross-appeal, again, the reasoning supplied in the PCRA court's opinion centers almost exclusively on the claims related to the pathologists' testimony concerning the significance of the bruise to the victim's chest; no rationale is supplied with regard to Appellee's other claims, and further, several claims were expressly left unresolved by the court. We will therefore remand for the PCRA court to address any unresolved claims as necessary to a final disposition of this matter, and to prepare a written opinion furnishing

[Appellee] explicitly that his chances of an acquittal at trial were poor and that it was more likely than not that he would be found guilty of first or third degree murder.
Exhibits to Petition for Relief Under the PCRA, at Exhibit D ¶¶ 48, 51–52.

15. In this regard, we emphasize that the PCRA judge was not the trial judge, and therefore, had no particular advantage over this Court in terms of understanding dynamics of the trial that are extrinsic to the written record.

16. Certainly, other dynamics of Dr. Park's post-conviction testimony, such as the inconsistency of the angle of the bullet wound to Mr. Christopher's thigh with the Commonwealth's theory of the case, were potentially more powerful, at least in the abstract. The Commonwealth, however, made several inroads into these lines of testimony on cross-examination and offered contradictory evidence from experts of its own. Additionally, the PCRA court did not render relevant factual findings, make credibility determinations, or expressly decide the case on such points. We therefore decline, at this juncture, to make a further assessment from the appellate perspective concerning prejudice associated with these other facets of Appellee's claim.

the basis for the disposition of each of Appellee's claims. *See generally Commonwealth v. Williams,* 557 Pa. 207, 253–55, 732 A.2d 1167, 1192–93 (1999) (Castille, J., concurring) (emphasizing the importance of an opinion of a post-conviction court covering all relevant issues). As to any claims requiring resolution of a material factual dispute, the court should include specific factual findings and express credibility judgments.

The order of the PCRA court is vacated and the matter is remanded for further proceedings consistent with this opinion.

Chief Justice CAPPY, Justice CASTILLE, Justice NEWMAN, Messrs. Justice EAKIN and BAER and Justice BALDWIN join the opinion.